IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ARLYN RICE SIBILLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:13-CV-566-WKW |
| | ) | [WO] |
| T.K. DAVIS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are the following motions: Plaintiff Arlyn Rice Sibille's motion for summary judgment on all counterclaims (Doc. # 93); the motion for summary judgment (Doc. # 102) filed by Defendants T.K. Davis, III, Patricia Y. Davis, and My Heidi, LLC; and Sibille's motion for partial summary judgment on her claim for constructive fraudulent transfer (Doc. # 106). Upon consideration of the motions, the court concludes that Sibille's motion for summary judgment on all counterclaims (Doc. # 93) is due to be granted; that Defendants' motion for summary judgment (Doc. # 102) is due to be granted in part as to a transfer of property known as Lot 6 Hamilton Place; and that Sibille's motion for partial summary judgment (Doc. # 106) is due to be denied.

## I.   STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean–Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id.* Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a

verdict in its favor.  *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

Cross-motions for summary judgment "must be considered separately," and "each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538-39 (5th Cir. 2004); *see also Bricklayers, Masons & Plasterers Int'l Union of Am., Local Union No. 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)[1] ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.").  In some cases, "[c]ross motions for summary judgment may be probative of the nonexistence of a factual dispute." *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983).  However, the existence of cross motions for summary judgment "'do[es] not automatically empower the court to dispense with the determination whether questions of material fact exist.'" *Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (quoting *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir.

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

1983)).  This is so because "each party moving for summary judgment may do so on different legal theories dependent on different constellations of material facts.  Indeed, cross-motions for summary judgment may demonstrate a genuine dispute as to material facts as often as not."  *Bricklayers*, 512 F.2d at 1023.

"'[W]hen both parties proceed on the same legal theory and rely on the same material facts[,] the court is signaled that the case is ripe for summary judgment." *Shook*, 713 F.2d at 665.  Even then, however, "[a] court may discover questions of material fact even though both parties, in support of cross-motions for summary judgment, have asserted that no such questions exist. . . . . Thus, before the court can consider the legal issues raised by the parties on cross-motions for summary judgment, it must have no doubt as to the relevant facts that are beyond dispute." *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 824 (11th Cir. 1984) (adopting order of district judge on summary judgment).

## II.   SUMMARY OF THE PARTIES' CLAIMS

Sibille filed this action pursuant to the Alabama Uniform Fraudulent Transfer Act ("AUFTA"), Ala. Code 1975 § 8-9A-1.  (Doc. # 55.)  Sibille seeks an order setting aside the conveyance of half of T.K. Davis's interest in My Heidi to his wife, Patricia Davis, in August 2011. Sibille also seeks orders setting aside certain August 2011 and October 2012 transfers of T.K. Davis's real property to My Heidi and Patricia Davis.  Sibille contends that the transfers were made

fraudulently to protect T.K. Davis's assets from execution in the event of an adverse judgment in a state court lawsuit that Sibille filed on July 18, 2011, to collect on a promissory note.

Patricia Davis contends that the promissory note upon which Sibille sought to collect secured the sale of real property in 2001, but that Sibille never delivered a valid deed for the property because her signature on the deed was forged.[2]  On the basis of her allegation that the 2001 deed was a forgery, Patricia Davis asserts a counterclaim for tortious interference with business relations on grounds that "the state court judgment was obtained by fraudulent means." (Doc. # 64 at ¶ 38.) Patricia Davis also asserts a counterclaim for abuse of process on grounds that Sibille "initiat[ed] this cause of action with full knowledge that she forged the deed that was the basis of the State Court Action, and that the Judgement obtained therein was wholly improper.  Specifically, by bringing this very action, Sibille has sought to use the process of Court for an ulterior purpose."  (Doc. # 64 at ¶ 43 (sic).)  In addition, Patricia Davis asserts a counterclaim for a declaratory judgment determining that Sibille's signature on the 2001 deed was forged, that the conveyance of Sibille's interest in the property is null and void, and that the state court judgment was obtained by fraudulent means.  (Doc. # 64 at 17.)  Further,

_____

[2] Sibille maintains that the signature on the 2001 deed is hers.  The state court found that Sibille's signature on the the 2001 deed was not forged.  Patricia Davis was not a party to the state court lawsuit, but T.K. Davis was.  Therefore, T.K. Davis, but not Patricia Davis, is collaterally estopped from contending that the 2001 deed was a forgery.  (Doc. # 84 at 27.)

although Patricia Davis never had an interest in the real property conveyed by the 2001 deed, Patricia Davis seeks a declaratory judgment clarifying her liability to subsequent purchasers of the property.

### III.   FACTS[3]

**A.    The State Court Lawsuit to Collect on the Promissory Note**

On January 18, 2001, Century Park, LLC, received a warranty deed from Sibille and her brother, John Rice, for an approximately 150-acre piece of property in Lee County, Alabama.  (Doc. # 94-1.)  In exchange for Sibille's interest in the property, Century Park provided Sibille a promissory note in the amount of $500,000, plus interest.   (Doc. # 108-4.)   Three of Century Park's members, including T.K. Davis, personally guaranteed the note, and they each also agreed to pay "a reasonable attorney's fee for collecting or attempting to collect" on the note. (Doc. # 108-4 at 2.)  The note came due on January 18, 2011.  (Doc. # 108-4.)  At the time the note came due, a principal balance was outstanding in the amount of $300,000.00, plus interest.

On July 15, 2011, Sibille filed the state court lawsuit[4] to collect on the note in the Circuit Court of Lee County, Alabama, against Century Park and its three

---

[3] Unless otherwise noted, the facts presented here are uncontradicted by record evidence.

[4] In her complaint, Sibille alleges that she made efforts to collect on the note between January 2011, when the note came due, and July 2011, when she filed the state court lawsuit. (Doc. # 55 at ¶¶ 17-20.)  However, at the summary judgment stage, Sibille did not provide

members, T.K. Davis, Donald H. Allen, and Warren A. Stiles. (Doc. # 108-4.)  On

November 1, 2013, the state court entered the following judgment in favor of

Sibille:

> Upon consideration of the evidence presented, the Court finds that the
> Defendants are liable to Plaintiff pursuant to the subject Promissory
> Note and Guaranty. The Court therefore ENTERS this JUDGMENT
> in favor of Plaintiff and against Defendants and awards damages of
> princip[al] in the amount of Three Hundred Thousand and No/100
> Dollars ($300,000.00) and interest in the amount of Sixty Nine
> Thousand and No/100 Dollars ($69,000.00), for which execution may
> issue. Costs are taxed against the Defendants.

(Doc. # 72-6).

## B.   August 31, 2011 Creation of My Heidi and Transfer of ½ of T.K. Davis's Interest in My Heidi to Patricia Davis

In July of 2011, T.K. Davis and Patricia Davis consulted attorney Gerald

Mattson, Jr., for estate planning purposes,[5] but not for assistance with the state

court lawsuit.   (Doc. # 104-2 at 8-9; Doc. # 104-4 at 19.)   With Mattson's

assistance, T.K. Davis created My Heidi on August 19, 2011, with T.K. Davis as

"the 100 percent owner." (Doc. # 104-2 at 15; Doc. # 104-4 at 17.)  On August 31,

2011, T.K. Davis transferred half of his interest in My Heidi to Patricia Davis.

---

evidence to support that allegation; therefore, that allegation is not taken as true for purposes of
the motions for summary judgment.

[5]  It is undisputed that the Davises consulted Mattson for estate planning purposes.  The
parties vigorously dispute whether one of those "estate planning purposes" was to fraudulently
protect T.K. Davis's estate from his creditor, Sibille, for his benefit and the benefit of his family
and heirs, including Patricia Davis.

(Doc. # 104-2 at 15-17; Doc. # 113-2 at 22; Doc. # 108-4 at 16-17.)   The assignment granted Patricia Davis "the right to a proportionate share of capital, distributions, income, gain, loss, deduction, or credit, or similar items, of My Heidi, LLC." (Doc. # 113-2 at 22.)

## C.   August 31, 2011 Transfer of T.K. Davis's Real Property to My Heidi, LLC

On August 31, 2011, in transactions facilitated by Mattson, T.K. Davis transferred to My Heidi all of his real property other than his interests in the marital residence and a beach house in Florida.   Specifically, T.K. Davis transferred the following real property to My Heidi on August 31, 2011:

- Lot 9-J of Executive Hills Town Homes, Inc., Executive Park Subdivision, which was then and is currently leased by a Chinese restaurant (Doc. # 104-4 at 24; Doc. # 108-4 at 22; Doc. # 90-1 at 9);

- a lot known as Lot 6 Hamilton Place, which, at the time, was leased to a prosthetics company (Doc. # 108-4 at 22; Doc. # 90-1 at 9);[6] and

- Lot P-114 of Pace's Peninsula Addition Subdivision, which is a lake house located on Lake Martin, Alabama.[7] (Doc. # 104-4 at 23; Doc. # 108-4 at 20.)

---

[6] My Heidi subsequently sold lot 6 Hamilton Place for fair market value to a third party, B&B Alabama Holdings, LLC.  (Doc. # 104-4 at 25-27.)

[7] Prior to the transfer, T.K. Davis and Patricia Davis jointly owned the lake house. They jointly executed the August 31, 2011 deed transferring the lake house to My Heidi.  (Doc. # 108-4 at 20.)

No money changed hands when these three properties were transferred to My Heidi. (Doc. # 104-4 at 76-77.) Although owned by My Heidi, the lake house is used solely as a family lake house for the Davises and not as income-producing property. (Doc. # 104-4 at 98.)

Prior to transferring the real property to My Heidi, on September 26, 2011, T.K. Davis assigned My Heidi his interests in the leases of Lot 9-J Hamilton Place and the lease of Lot 6 Hamilton Place. (Doc. # 90-1 at 9.) My Heidi assumed T.K. Davis's obligations under the leases. (Doc. # 90-1 at 9.) My Heidi engaged a company called First Realty to manage the lease with the Chinese restaurant. (Doc. # 104-4 at 59.)

Mattson did not include the Davises' Florida beach house in the assets transferred to My Heidi in August 2011 because the Davises were thinking about selling that property. (Doc. # 104-2 at 22.) In March 2015, the Davises sold the Florida beach house for approximately $569,000.00. (Doc. # 104-4 at 41.) Although they owned the beach property together as tenants by the entirety, all of the money from the sale went to Patricia Davis and was placed in her personal bank account. (Doc. # 104-4 at 68-69.) T.K. Davis testified that he gave Patricia Davis his portion of the proceeds from the sale because he wanted her to have the money, and because he did not want Sibille's attorneys to get it. (Doc. # 104-4 at 69-70.)

**D.     October 12, 2012 Transfer of T.K. Davis's Interest in the Marital Residence to Patricia Davis**

Mattson did not include the Davises' marital residence in the assets transferred to My Heidi in August 2011. (Doc. # 104-2 at 21-23; Doc. # 108-4 at 18-19.)  Mattson created a deed dated August 31, 2011, that effectively changed the Davises' interest in their marital residence[8] from joint tenancy in common with right of survivorship to joint tenancy in common. (Doc. # 104-2 at 21-23; Doc. # 108-4 at 18-19.)[9]  Mattson's estate plan would not have "balanced" if the house had been transferred solely to one spouse or the other. (Doc. # 104-2 at 23.).

---

[8] Deeds transferring the marital residence describe the property as "Lot Number 2 of T.K. Davis subdivision." (Doc. # 108-4 at 18; Doc. # 108-4 at 24.)

[9] In Sibille's complaint and summary judgment submissions, she mistakenly alleges that the August 31, 2011 deed conveyed half of T.K. Davis's previously one-hundred-percent interest in the marital home to Patricia Davis. (Doc. # 55 at ¶ 24 and at page 10.) However, the *evidence* submitted on summary judgment, including evidence submitted by Sibille herself, establishes that the August 31, 2011 deed simply changed the Davises' interest in their personal marital residence from joint tenancy in common with right of survivorship to joint tenancy in common. (Doc. # 108-4 at 18-19 (the only August 31, 2011 deed to the marital residence that is contained in this record); Doc. # 104-2 at 21-23 (attorney Mattson's testimony about the August 31, 2011 deed to the marital residence).)  The court notes that T.K. Davis testified in his deposition that he "thought" that, prior to August 31, 2011, he alone owned the marital residence, but that is not consistent with plain terms of the only August 31, 2011 deed to the marital residence that is included in this record, which lists T.K. Davis and Patricia Davis both as grantors and grantees, or with Mattson's recollection of the transfer. (Doc. # 104-4 at 28.)  It is undisputed, however, that T.K. Davis did transfer his interest in the marital residence to Patricia Davis on October 12, 2011. (Doc. # 104-2 at 24; Doc. # 108-4 at 24.)

This is only one example of a recurring problem on summary judgment and also in this case as a whole: the parties have been proceeding on a haphazard understanding of critical and undisputed facts, such as the dates of the transactions at issue and the contents and substance of various legal documents, evidence, and testimony. (*See also* Doc. # 49 (June 10, 2014 Order addressing the parties' failure to provide coherent sets of factual allegations in their pleadings).)  On summary judgment, the parties' lax approach has created an extra burden on the court to comb through the evidentiary submissions to determine which factual disputes are legitimate

Without Mattson's knowledge or involvement, on October 12, 2012, T.K. Davis transferred his half interest in the marital residence to Patricia Davis.  (Doc. # 104-2 at 24; Doc. # 108-4 at 24.)  T.K. Davis testified that he made this transfer so that Patricia Davis would not have to "go through trying to transfer title of property to her name after [he] passed away."  (Doc. # 104-4 at 49.)

## E. October 12, 2012 Transfer of the "Davis-Dyar" Real Property to My Heidi

In September 2012, T.K. Davis purchased property known as the Davis-Dyar property.  (Doc. # 104-4 at 29-31; Doc. # 108-4 at 29.)  He purchased the property at a foreclosure sale for no less than $714,024.00. (Doc. # 108-4 at 29.) On September 27, 2012, to finance the purchase of the property, he took out a purchase money mortgage in the amount of $714,024.00.  (Doc. # 104-4 at 29-31, 77; Doc. # 108-4 at 29.)  The Davis-Dyar property mortgage was in T.K. Davis's name.  (Doc. # 104-4 at 30.)

---

products of conflicting evidence or competing factual inferences, and which are simply the result of one party or the other mistaking or misquoting the contents of uncontradicted evidence.  *See Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 824 (11th Cir. 1984) (adopting order of district judge on summary judgment) ("A court may discover questions of material fact even though both parties, in support of cross-motions for summary judgment, have asserted that no such questions exist. . . . .  Thus, before the court can consider the legal issues raised by the parties on cross-motions for summary judgment, it must have no doubt as to the relevant facts that are beyond dispute.").  **The parties are strongly encouraged to read this opinion in preparation for submitting a proposed pretrial order so that they may familiarize themselves with the timeline and facts of this case as established by the evidence they themselves have thus far submitted.**

On October 12, 2012, T.K. Davis deeded the Davis-Dyar property to My Heidi.  (Doc. # 108-4 at 26.)  The deed recites that the transfer was in exchange for "[$10.00] and other good and valuable consideration."  (Doc. # 108-4 at 26.) However, no money changed hands between T.K. Davis and My Heidi with respect to the transaction.  (Doc. # 104-4 at 77.)  My Heidi assumed T.K. Davis's obligation to pay the mortgage on the Davis-Dyar property.  (Doc. # 104-4 at 30-31, 77.)

On summary judgment, T.K. Davis alleges that he "recently sold the Davis-Dyar building to a third party for the collective amount of $650,000.00."  (Doc. # 116 at 2.  The evidence submitted by T.K. Davis in support of this contention consists of a June 18, 2013 "Lease Agreement With Option to Purchase" and a November 15, 2014 "Lease Agreement With Option to Purchase."  (Doc. # 116-1 at 1, 8).  The leases state that they are between "My Heidi, LLC, and Thomas K. Davis[,] III[,] individually, hereinafter called LANDLORD" and lessee Marsh Real Estate Investments for portions of the Davis-Dyar property.  (Doc. # 116-1 at 1, 8). The leases obligated Marsh Realty to pay rent to "LANDLORD," and the record includes at a copy of a check from Marsh Realty to My Heidi and T.K. Davis. (Doc. # 116-1 at 1, 8; Doc. # 113-3 at 2.)  The leases provide options to purchase one portion of the Davis-Dyar property for $275,000.00, and another portion for $375,000.00, but the leases do not indicate whether the tenant has exercised the

option to purchase or, if so, whether the purchase price was for the amounts specified in the leases.  (Doc. # 116 at 1, 5, 8, 12.)

**F.**   **T.K. Davis's Remaining Assets and Property**

Except for T.K. Davis's clothes, glasses, hearing aids, and a big screen television that Patricia Davis does not want, Patricia Davis is the sole owner of all household items in the Davis home.  (Doc. # 104-4 at 41-43.)  Patricia Davis is a homemaker who does not work outside the home, and she did not purchase the items.  (Doc. # 104-4 at 41-42.)   T.K. Davis testified that Patricia Davis acquired the items when he transferred ownership of all household furnishings to her sometime before August 2011.  (Doc. # 104-4 at 42.)

In August 2011, T.K. Davis owned a Toyota Land Cruiser worth $30,000.00 that was later stolen and wrecked.  (Doc. # 104-4 at 37.)  He also owned a Toyota Tocoma worth $28,000.00 that he purchased for $7,500.00 at a sheriff's auction. (Doc. # 104-4 at 37-38.)  Neither vehicle was transferred to My Heidi.  T.K. Davis currently owns no vehicles in his personal name.  (Doc. # 104-4 at 38.)  T.K. and Patricia Davis share a KIA owned by My Heidi that was purchased in June 2014 for $38,600.00.   (Doc. # 104-4 at 62-65.)   They use the KIA for My Heidi's business and for their own personal errands.  (Doc. # 104-4 at 62-65.)

Aside from T.K. Davis's household possessions, his vehicles, an IRA account, his interest in the Florida beach house (that was subsequently sold with all

proceeds given to Patricia Davis), and his interest in the marital residence (that was subsequently transferred to Patricia Davis), all of T.K. Davis's substantial assets were transferred to My Heidi in August 2011.  (Doc. # 104-4 at 39-40.)  In August 2011, T.K. Davis's assets that were not transferred to My Heidi were not sufficient to pay a $400,000 debt.  (Doc. # 104-4 at 91.)

T.K. Davis has stopped using his personal checking account, and he does not have a personal bank account "with any money in it."   (Doc. # 104-4 at 67-68.) He testified that he does use a personal bank account "because of this litigation" and because he does not want Sibille and her attorneys to take any money from him.  (Doc. # 104-4 at 67-68.)  As a matter of routine, all checks made out to T.K. Davis, such as social security checks, are deposited in Patricia Davis's personal banking account.  (Doc. # 104-4 at 84-85.)  T.K. Davis testified that he arranged for Patricia Davis to handle all of his and the couple's personal finances and expenses because he wanted her to learn how in case he predeceases her.[10]  (Doc. # 104-4 at 84-85.)

In his deposition, T.K. Davis testified that, to his knowledge, all of the funds deposited to My Heidi's bank account were derived from the properties owned by My Heidi, and that he had never deposited his personal funds into the account. (Doc. # 104-4 at 65.)  However, when T.K. Davis received a $41,990.00 check

---

[10] T.K. Davis was born on January 15, 1942. (Doc. # 104-4 at 7.)

made out to him from his insurance company for the stolen and wrecked Land Cruiser, T.K. Davis deposited that check to My Heidi's bank account. (Doc. # 104-4 at 66-67.) He testified that he deposited the check into the My Heidi account because he did not want Sibille and her attorneys to be able to get it, and because My Heidi's account was "the only account [he] could write a check on." (Doc. # 104-4 at 67-68.)

Currently, T.K. Davis has no personal assets other than exempt retirement accounts and his interest in My Heidi with which to satisfy the judgment against him in the state court action. (Doc. # 104-4 at 90-91.) T.K. Davis's interest in My Heidi is worth "more than $600,000."[11] (Doc. # 104-4 at 94.) T.K. Davis has not paid the state court judgment because he believes the state court judgment was obtained by fraud because Sibille's signature on the 2001 deed was forged. (Doc. # 104-4 at 96.) He formed that belief sometime after this lawsuit was filed. (Doc. # 104-4 at 99.) Prior to that time, for over ten years, he had not questioned the validity of the 2001 deed. (Doc. # 104-4 at 100.)

On February 23, 2015, the Circuit Court of Lee County, Alabama, issued a charging order on My Heidi, LLC in favor of Sibille. (Doc. # 104-1.) The charging order provided that My Heidi "shall pay or deposit any distributions to which [T.K. Davis] would otherwise be entitled with the Circuit Clerk of Lee

---

[11] The parties have not submitted evidence establishing *how much* "more than $600,000.00" T.K. Davis's interest in My Heidi is worth.

County."  (Doc. # 104-1.)  However, My Heidi makes no distributions to either of the Davises.  (Doc. # 104-4 at 97.)

## IV.   DISCUSSION

### A.   Lot 6 Hamilton Place

In her complaint, Sibille seeks an order voiding the August 31, 2011 transfer of Lot 6 Hamilton Place to My Heidi.  Since the filing of this action, My Heidi sold Lot 6 Hamilton Place to a third party who is not a party to this lawsuit.  In their summary judgment filings, the parties have stated their agreement that Sibille will no longer seek an order voiding the transfer of Lot 6 Hamilton Place to My Heidi. (Doc. # 103 at 9 n.6; Doc. # 107 at 3 n.3.)  Accordingly, Defendants are entitled to summary judgment on Sibille's AUFTA claims insofar as Sibille seeks an order voiding the transfer of Lot 6 Hamilton Place to My Heidi.

### B.   The Davis-Dyar Property

Under AUFTA, a "transfer" is "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."   Ala. Code § 8-9A-1(13).   AUFTA defines an "asset" as "property of a debtor, but the term does not include [p]roperty to the extent it is encumbered by a valid lien."  Ala. Code 1975 § 8-9A-1(2)(a).

Defendants argue that the Davis-Dyar property was not an "asset," and therefore could not have been fraudulently transferred to My Heidi, because it was encumbered by a $714,024.00 mortgage at the time of the October 2012 transfer. Relying on the tax appraisal of the property at $1,494,870.00, Sibille contends that, at the time of the transfer, the mortgage was for less than the value of the property, and, therefore, the property was an "asset" to the extent that it was not encumbered by the mortgage.  Ala. Code 1975 § 8-9A-1(2)(a).  (Doc. # 113 at 5.)

Defendants contend that the tax appraisal cannot be considered an accurate representation of the property's value.  Defendants further argue that "My Heidi recently sold the Davis-Dyar building to a third party for the collective amount of $650,000.00," which should be considered evidence of the value of the property. (Doc. # 116 at 2.)  As noted in Section III.E., the evidence Defendants cite in support of their contention that My Heidi sold the property for fair market value consists of lease agreements that do not prove whether the property was sold or, if so, to whom, for how much, or on what basis the sale price was calculated.  (Doc. # 116-1.)

The court concludes that genuine disputes of material fact remain as to whether the Davis-Dyar property was an asset as defined by AUFTA.  Further, there appears to be some question at this point whether the property was sold during the pendency of this action, thus potentially precluding the relief Sibille

seeks in the absence of the third party purchaser.  Moreover, the relief Sibille seeks is an order voiding the transfer; Sibille has not offered any explanation as to how the transfer of the Davis-Dyar property to My Heidi could be voided only partially to the extent that the property was unencumbered at the time of the transfer. Accordingly, the motions for summary judgment will be denied as to Sibille's claims that T.K. Davis fraudulently transferred the Davis-Dyar property to My Heidi.

## C.   **Constructive Fraudulent Transfer**

The parties have filed cross-motions for summary judgment on Sibille's claim for constructive fraudulent transfer. (Doc. # 102; Doc. # 106.)   Claims alleging constructive fraudulent transfer are governed by Alabama Code 1975 § 8-9A-5(a), which provides:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer.

### 1.   *Sibille Is a Creditor Whose Claim Arose Before the Transfers Were Made.*

Under AUFTA, a "creditor" is "[a] person who has a claim," and a "debtor" is "[a] person who is liable on a claim."   Ala. Code 1975 § 8-9A-1(4), (6). AUFTA defines a "claim" as "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Ala. Code 1975 § 8-9A-1(3).   All of the allegedly fraudulent transfers occurred after T.K. Davis guaranteed the note in January 2001, after the note matured in January 2011, and after Sibille filed the state court lawsuit in July 2011.   It is therefore undisputed that Sibille is a creditor, T.K. Davis is a debtor, and Sibille's claim arose before T.K. Davis made the transfers.   *See* Ala. Code 1975 § 8-9A-5(a) (providing that, under certain circumstances, a transfer is constructively fraudulent "as to a creditor whose claim arose before the transfer").

### 2.   *The Court Will Not Address Whether T.K. Davis Received Reasonably Equivalent Value in Exchange for the Transfers.*

The parties raise several arguments as to whether T.K. Davis received reasonably equivalent value for the transfers at issue.   T.K. Davis argues that he received valuable consideration in the form of "inevitable benefits" incidental to conveying the property, such as not having to pay an unspecified amount of property taxes and the fact that his heirs will inherit his share of My Heidi's interest in the property without having to pay estate taxes or probate a will.   *But see* Ala. Code 1975 § 8-9A-5(a) (providing that, under certain circumstances, a transfer is constructively fraudulent "if the debtor made the transfer without receiving a reasonably equivalent value *in exchange for the transfer*" (emphasis added)); *Horton v. Alexander*, 977 So. 2d 462, 466 (Ala. 2007) (recognizing that "fair consideration" and "reasonably equivalent value" have "very similar

meanings"); *Kelsoe v. Int'l Wood Prods., Inc.*, 588 So. 2d 877, 878 (Ala. 1991) (holding that consideration is something of value – "an act, a forbearance, a detriment, or a destruction of a legal right, or a return promise [–] *bargained for and given in exchange*" for a benefit or a promise.  (emphasis added)); *McPherson Oil Co. v. Massey*, 643 So. 2d 595, 596 (Ala. 1994) ("[A] conveyance given in return for 'love and affection' is supported by 'good,' rather than 'valuable' consideration, and is thus a voluntary conveyance and void against existing creditors."); *Manchuria S.S. Co. v. Harry G.G. Donald & Co.*, 77 So. 12, 16 (Ala. 1917) (holding, in a case decided before the enactment of AUFTA, that "[a]s a general rule, the provision in a transfer of property by a person indebted at the time, whereby he reserves or secures a benefit to himself or his family at the expense of his creditors, unless it be consented to by such creditors, is deemed to be evidence of a fraud, either actual or constructive, and renders the transfer liable to be avoided at the instance of creditors"); *Nash v. Vann,* 390 So. 2d 301, 303 (Ala. Civ. App. 1980) ("Adequate consideration exists, or is implied, if it arises from any *act of the plaintiff* from which the defendant derived a pecuniary benefit . . . *if such act was performed by the plaintiff to the desired end, with the expressed or implied assent of the defendant*." (emphasis added)).

The court will not address whether T.K. Davis received reasonably equivalent value in exchange for the transfers because, as explained in Section

IV.C.3., the court concludes that genuine disputes of material fact exist as to whether T.K. Davis was insolvent at the time of the transfers or became insolvent as a result of the transfers.

**3.      *Genuine Disputes of Material Fact Exist as to Whether T.K. Davis Was Insolvent at the Time of the Transfers or Became Insolvent As a Result of the Transfers***

In their summary judgment motion, Defendants argue that there is simply no evidence that T.K. Davis was insolvent at the time of the transfers or that he became insolvent as a result of the transfers.  (Doc. # 103 at 17.) *See* Ala. Code 1975 § 8-9A-5(a) (providing that, under certain circumstances, a transfer is constructively fraudulent if "the debtor was insolvent at th[e] time [of the transfer] or the debtor became insolvent as a result of the transfer").

AUFTA defines insolvency as follows:

(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

. . . .

(d) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.

(e) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

Ala. Code § 8-9A-2.

21

AUFTA defines "debt" as "liability on a claim."   Ala. Code § 8-9A-1(5).

AUFTA defines "asset" as follows:

> Asset. Property of a debtor, but the term does not include:
>
> a. Property to the extent it is encumbered by a valid lien;
>
> b. Property to the extent it is generally exempt under nonbankruptcy law; or
>
> c. An interest in property held in tenancy in common for life with cross contingent remainder to the survivor in fee to the extent it is not subject to process by a creditor holding a claim against only one tenant.

Ala. Code § 8-9A-1(2).

Thus, the insolvency element of a constructively fraudulent transfer is satisfied if the sum of T.K. Davis's debts (as defined by AUFTA) exceeded the sum of his assets (as defined by AUFTA) either at the time of the transfers, or as a result of the transfers.

T.K. Davis's IRA and beach house were not transferred to My Heidi, but they do not count as "assets" for calculating insolvency under AUFTA because they are exempted under nonbankruptcy law.[12]  Ala. Code § 8-9A-1(2)(b).  At the time of the August 2011 transfers, T.K. Davis testified that, *other than* his IRA

---

[12] T.K. Davis's IRA account was not an "asset" because it is exempt under Ala. Code 1975 § 19-3B-508. T.K. Davis's interest in the Florida beach property was not an "asset" because it was owned with Patricia Davis in tenancy by the entirety (Doc. # 104-2 at 22) and was therefore exempt under Florida nonbankruptcy law.  *Winters v. Parks*, 91 So. 2d 649, 651 (Fla. 1956).

retirement account, his interest in his beach house, and the property he transferred to My Heidi, he did not have sufficient assets in August 2011 to satisfy a $400,000.00 debt. (Doc. # 104-4 at 91.)

In August 2011, T.K. Davis owed $300,000.00 outstanding principal balance, plus interest, on the promissory note to Sibille.[13]  There is no evidence on summary judgment that the outstanding balance on the promissory note to Sibille

---

[13] T.K. Davis also owed other debts, but the evidence on summary judgment is insufficient to establish their amount or existence at the time of the transfers without drawing impermissible inferences in Sibille's favor and without weighing evidence. Sibille argues that T.K. Davis was liable on a debt to Synovus Bank. (Doc. # 113 at 9.)   The evidence cited by Sibille establishes that the amount of the Synovus Bank debt was originally $200,000.00 or $300,000.00. (Doc. # 113 at 9; Doc. # 104-4 at 51-53.)   However, the evidence does not establish the date on which T.K. Davis incurred the debt to Synovus Bank or the amount of debt (if any) at the time of the allegedly fraudulent transfers. (Doc # 104-4 at 51-53.)   Sibille also argues that, in August 2011, T.K. Davis owed an outstanding debt of $900,000.00 plus interest to John Rice. (Doc. # 113 at 9.)   Sibille cites evidence that T.K. Davis incurred the $900,000.00 debt in 2001 (Doc. # 108-1 at 9; Doc. # 104-4 at 45), but Sibille does not cite any *evidence* showing that the debt (or any portion of it) remained outstanding in August 2011 or thereafter. Sibille also contends that T.K. Davis owed a debt in excess of $2,000,000.00 to Frontier Bank. The evidence Sibille submitted establishes that, in August 2011 and in October 2012, T.K. Davis likely was liable on a personal guarantee of a loan to Century Park, LLC, from Frontier Bank. (Doc. # 104-2 at 26; Doc. # 104-4 at 50-51.)   However, the only evidence Sibille submitted on summary judgment as to the amount of the debt owed Frontier Bank at the time of the transfers is a copy of a complaint filed by Frontier Bank on January 13, 2013, alleging that T.K. Davis was liable on a personal guarantee "in the amount of $2,171,678.81, plus interest." (Doc. # 108-1 at 13.)  Although the court may take judicial notice of the existence and contents of the state court complaint, allegations in the state court complaint are not evidence that those facts are true.  *See United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (holding that a court may take judicial notice of the existence and contents of orders and other documents filed in another court, but not of the truth of the matters asserted therein).  *Cf. Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990) ("A party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings. Rather, its responses, either by affidavits or otherwise as provided by the rule, must set forth specific facts showing that there is a genuine issue for trial.").  Therefore, on summary judgment, the court will not consider these debts for purposes of determining whether T.K. Davis "was insolvent at th[e] time [of transfers] or . . . became insolvent as a result of the transfer[s]." Ala. Code 1975 § 8-9A-5(a).

exceeded $400,000.00 in August 2011.  Accordingly, the evidence submitted on summary judgment is simply insufficient to establish whether, at the time of or as a result of the August 2011 transfers, T.K. Davis had sufficient assets to satisfy his debt to Sibille.  Therefore, as to the August 2011 transfers, the motions for summary judgment on Sibille's constructive fraudulent transfer claims are due to be denied.

In September 2012, T.K. Davis acquired the Davis-Dyar property at a foreclosure sale and financed the purchase with a purchase money mortgage in his name.  (Doc. # 104-4 at 29-31; Doc. # 108-4 at 29; Doc. # 104-4 at 29-31, 77; Doc. # 108-4 at 29.)  On October 12, 2012, T.K. Davis conveyed his half interest in the marital home to Patricia Davis and the Davis-Dyar property to My Heidi.  (Doc. # 108-4 at 26; Doc. # 104-2 at 24; Doc. # 108-4 at 24.)  As explained in Section IV.B., the extent to which the Davis-Dyar property qualifies as an asset under AUFTA cannot be resolved on summary judgment, and the value of the property is a disputed issue of fact.  Therefore, the court cannot calculate, on the basis of undisputed facts, whether T.K. Davis's debts exceeded his assets prior to the transfers in October 2012, or whether he became insolvent as a result of the October 2012 transfers.  Accordingly, summary judgment will be denied as to Sibille's claims that the October 2012 transfers were constructively fraudulent.

D.    **Actual Fraudulent Transfer**

Pursuant to AUFTA, "[a] transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor."   Ala. Code § 8-9A-4(a).   T.K. Davis filed a motion for summary judgment on Sibille's claim for actual fraudulent transfer.  (Doc. # 103 at 14-18.)   Sibille opposed the motion for summary judgment on grounds that genuine disputes of material fact exist as to her claim for actual fraudulent transfer, but she did not file a cross-motion for summary judgment on that claim.  (Doc. # 113 at 6-10.)

T.K. Davis admitted under oath that certain transfers of money to Patricia Davis and to My Heidi were made with the actual intent to hinder Sibille's ability to collect on her claim.  (Doc. # 104-4 at 67-68 (T.K. Davis's testimony that he does not keep a personal bank account and gives Patricia Davis all checks made out to him because he does not want Sibille to access any money that belongs to him); Doc. # 104-4 at 66-68 (T.K. Davis's testimony that he deposited an insurance check for a stolen vehicle in My Heidi's bank account because he did not want Sibille to get the money and because My Heidi's account was "the only account [he] could write a check on").)  However, those financial transactions are not the transfers that are the subject of Sibille's complaint.

25

T.K. Davis's actual intent with respect to the August 2011 and October 2012 transfers that were the subject of the complaint must be determined by circumstantial evidence.  Under AUFTA, actual intent to hinder, delay, or defraud a creditor may be determined by a number of factors, including: whether the transfer was to an insider; whether the debtor retained possession or control of the property transferred; whether the transfer was disclosed or concealed; whether, before the transfer was made, the debtor had been sued or threatened with suit; whether the transfer was of substantially all the debtor's assets; whether the debtor absconded; whether the debtor removed or concealed assets; whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; whether the debtor was insolvent or became insolvent shortly after the transfer was made; and whether the transfer occurred shortly before or shortly after a substantial debt was incurred.  Ala. Code 1975 § 8-9A-4(b).

Certain of the relevant factors are undisputed.  For example, it is undisputed that T.K. Davis made the transfers to insiders; that he retained control and possession of the properties; that he did not hide the transfers; that Sibille filed the state court lawsuit before T.K. Davis made the transfers; that, prior to making the transfers, T.K. Davis knew he had been sued;[14] that he did not abscond; and that

---

[14] As stated in Ala. Code 1975 § 8-9A-4(b), the relevant inquiry is whether, "before the transfer was made[,] the debtor had been sued or threatened with suit;" the statute does not expressly place importance on whether the debtor *knew* he had been sued or threatened with a

the October 12, 2012 transfers occurred fifteen days after T.K. Davis took out a purchase money mortgage on the Davis-Dyar property for $714,024.00.  (*See* Doc. # 103 at 14-18; Doc. # 113 at 6-10; Doc. # 108-4 at 26-29.)   Genuine factual disputes exist, however, as to whether the transfers were for substantially all of T.K. Davis's assets; whether he removed or concealed assets; and whether he was insolvent or became insolvent shortly after the transfers were made.[15] (*See* Doc. # 103 at 14-18; Doc. # 113 at 6-10.)   Further, in light of the numerous disputed issues of fact, it is unnecessary to consider whether T.K. Davis received reasonably equivalent value for the assets transferred.

Accordingly, on the basis of the evidence presented on summary judgment, and because a determination of T.K. Davis's actual intent necessarily requires the court to weigh counterbalancing disputed and undisputed facts, the court cannot

lawsuit.  However, the factors listed in § 8-9A-4(b) are not exclusive, and knowledge of suit may be a relevant inquiry.  In this case, T.K. Davis does not dispute that he knew about Sibille's suit prior to the October 2012 transfers.  T.K. Davis testified in his May 8, 2015 deposition that, when he initiated the process of creating My Heidi, he was unaware of the existence of Sibille's lawsuit; however, T.K. Davis twice admitted during his deposition that, before the process of transferring property to My Heidi was finalized on August 31, 2011, he was aware that Sibille had sued him.  (Doc. # 104-4 at 2, 34-35.)  T.K. Davis's subsequent affidavit dated August 13, 2015, stating that he "was not made aware of the existence of the state court action until early-to-mid October 2011," flatly contradicts T.K. Davis's deposition testimony without giving any explanation for the contradiction.  Therefore, T.K. Davis's August 13, 2015 affidavit will be disregarded for purposes of summary judgment, and, for purposes of summary judgment, it is an undisputed fact that he "knew about the state court lawsuit when he made the allegedly fraudulent transfers.  *See Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

[15] See Section IV.C.3. for an explanation of the unresolved factual issues pertaining to insolvency.

determine on summary judgment whether, as a matter of law, T.K. Davis had an actual intent to hinder, delay, or defraud Sibille with respect to the August 2011 and October 2012 transfers.   Therefore, summary judgment will be denied as to Sibille's claim for actual fraud.  *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986) ("The court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied.").

**E.**     **Ala. Code 1975 § 8-9A-4(c)**

In addition to provisions governing actual and constructive fraudulent transfers, AUFTA contains the following provision:

> A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor:
>
> > (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> >
> > (2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Ala. Code § 8-9A-4(c).

Sibille's complaint contains allegations that T.K. Davis made fraudulent transfers in violation of Ala. Code § 8-9A-4(c).  (Doc. # 55 at 9 ¶¶ 42-43.)  Neither

28

party filed a summary judgment motion on this claim.[16]   Accordingly, summary judgment will not be granted on this claim.

## F.   <u>Patricia Davis's Counterclaims</u>

Patricia Davis[17] asserts three counterclaims: a counterclaim for tortious interference with business relations; a counterclaim for abuse of process; and a counterclaim for a declaratory judgment to determine Patricia Davis's liability to subsequent third-party *bona fide* purchasers of the 150 acre-property that was the subject of the 2001 deed from Sibille to Century Park. (Doc. # 64 at ¶¶ 35-53.) Sibille filed a motion for summary judgment on all three counterclaims.  (Doc. # 93.)  In response to Sibille's motion for summary judgment, Patricia Davis agreed to abandon her counterclaims for tortious interference with business relations and for declaratory judgment.[18]   (Doc. # 98 at 3.)   Accordingly, Sibille is entitled to summary judgment on those two counterclaims.

In her counterclaim for abuse of process, Patricia Davis alleges that, "[b]y initiating this cause of action with full knowledge that she forged the deed that was

---

[16] Defendants' conclusory statement in a footnote in a summary judgment brief that Ala. Code § 8-9A-4(c) is "not at issue in this case" is not accurate.  (Doc. # 103 at 12 n.9.)

[17] The counterclaims of the other Counterclaim Plaintiffs, Donald H. Allen, Warren A. Styles, T.K. Davis, and Century Park, have already been dismissed on grounds that they are collaterally estopped to deny the validity of Sibille's signature on the 2001 deed to Century Park. (Doc. # 64 at ¶¶ 35-53; Doc. # 84 at 27.)

[18]  Patricia Davis was not a party to the contractual relationships that were the subject of her counterclaim for tortious interference with business relations.  Further, she never had an interest in the property that was the subject of her declaratory judgment claim.

the basis of the [state court lawsuit], and that the [judgment] obtained therein was wholly improper, [Sibille] instituted this very case (*i.e.*, regular and valid process) for a result that is not lawfully attainable."  (Doc. # 64 at ¶ 43.)  Patricia Davis further alleges that she was damaged by "Sibille's abuse of process, both in this case and in the [state court lawsuit]."  (Doc. # 64 at ¶ 15.)

Under Alabama law, "[t]he elements of the tort of abuse of process are 1) the existence of an ulterior purpose, 2) a wrongful use of process after it has been issued, and 3) malice."  *C.C. & J., Inc. v. Hagood*, 711 So. 2d 947, 950 (Ala. 1998).  It is undisputed that Sibille filed the state court lawsuit to collect on the note and that she stated as much in her state court complaint.  (Doc. # 108-4.)  It is undisputed that Sibille filed this lawsuit in furtherance of her efforts to collect on the state court judgment, and her complaint is forthcoming about that fact.  (Doc. # 55.)  As Sibille points out, there is no evidence that she wrongfully used process after it had issued in either suit, or that she did so with malice or some ulterior purpose.

In Sibille's complaint, she seeks an order setting aside the August 31, 2011 deed to the marital residence on the basis of her mistaken allegation that the August 31, 2011 deed conveyed half of T.K. Davis's previously one-hundred-percent interest in the marital home to Patricia Davis.  (Doc. # 55 at  ¶ 24 and at page 10.)   However, the only August 31, 2011 deed to the marital property

currently in the record simply changed the Davises' interest in their personal marital residence from joint tenancy in common with right of survivorship to joint tenancy in common.  (Doc. # 108-4 at 18-19 (August 31, 2011 deed conveying the marital residence from T.K. Davis and Patricia Davis to T.K. Davis and Patricia Davis); Doc. # 104-2 at 21-23 (attorney Mattson's testimony about the August 31, 2011 deed to the marital residence).)   Therefore, the undisputed evidence establishes that T.K. Davis did not transfer his interest in the marital residence to Patricia Davis until October 12, 2011.  (Doc. # 104-2 at 24; Doc. # 108-4 at 24.) Patricia Davis argues that Sibille abused process because, if Sibille's attorneys had realized that the August 2011 deed for the marital property was not the deed that transferred T.K. Davis's interest in the marital home to Patricia Davis, Patricia Davis "likely would have avoided this entire farce of a case."  (Doc. # 98 at 5.)

Patricia Davis's argument is flawed for several reasons.   First, Patricia Davis's counterclaim is premised on the allegation that Sibille instituted this case to collect on a fraudulently obtained state court judgment, not Sibille's mistaken allegation in the complaint that the August 2011 deed conveyed a half-portion of T.K. Davis's interest in the marital home to Patricia Davis.   (Doc. # 64 at ¶¶ 42-45.)  Second, Patricia Davis fails to establish that malice or ulterior motives can be inferred from Sibille's mistake in referencing the wrong deed in her complaint. Third, Patricia Davis's argument overlooks the requirement that an action for

abuse of process requires a showing of wrongful use of process after it has been issued. *Hagood*, 711 So. 2d at 950.  Fourth, because Patricia Davis was a party to or has a legally protectable interest in other transactions that form the basis of this action, she would still be a party to this case even if Sibille's complaint had not included a request for an order setting aside the transfer of T.K. Davis's interest in the marital residence.

Sibille argues that, to the extent Patricia Davis contends that she improperly instituted this lawsuit or the state court lawsuit, Patricia Davis may be attempting to state a claim for malicious prosecution, not abuse of process.  *Hagood*, 711 So. 2d at 950 ("Malicious prosecution concerns the wrongful issuance of process; abuse of process concerns the wrongful use of process after it has been issued."). *See* Fed. R. Civ. P. 8 ("Pleadings must be construed so as to do justice.")  The court notes that, in arguing that Sibille abused process, Patricia Davis cites *Willis v. Parker*, 814 So. 2d 857, 863 (Ala. 2001), for the proposition that, "'[i]n determining probable cause for the initiation of civil proceedings, all that is necessary is that the claimant reasonably believe that there is a chance that his claim may be held valid upon adjudication.'"  *Willis*, 814 So. 2d at 863.  Patricia Davis's quotation from *Willis* "define[s] probable cause in a malicious prosecution action." *Id.*

To establish a claim for malicious prosecution under Alabama law, Patricia Davis must prove: (1) that Sibille initiated a previous judicial proceeding against Patricia Davis; (2) that Sibille initiated the judicial proceeding without probable cause; (3) that Sibille initiated the judicial proceeding maliciously; (4) that the judicial proceeding was terminated in favor of Patricia Davis; and (5) that Patricia Davis suffered damage as a proximate cause of the judicial proceeding. *Eidson v. Olin Corp.*, 527 So. 2d 1283, 1284 (Ala. 1988). However, Patricia Davis was not a party to the state court lawsuit, which, in any event, was terminated in favor of Sibille. Therefore, as a matter of law, with respect to the state court lawsuit, Patricia Davis cannot establish the first and fourth elements of a malicious prosecution claim. Patricia Davis cannot state a malicious prosecution claim on the basis of this present action because, by definition, a claim for malicious prosecution must pertain to a previous lawsuit that concluded in favor of the malicious prosecution plaintiff. *Eidson*, 527 So. 2d at 1284.

Therefore, Sibille is entitled to summary judgment on Patricia Davis's counterclaims.

## V.   CONCLUSION

Accordingly, it is ORDERED:

1.   Sibille's motion for summary judgment on all of Patricia Davis's counterclaims (Doc. # 93) is GRANTED.

2.      Defendants' motion for summary judgment (Doc. # 102) is GRANTED IN PART as to the August 31, 2011 transfer of real property known as Lot 6 Hamilton Place from T.K. Davis to My Heidi.  In all other respects, Defendants' motion for summary judgment (Doc. # 102) is DENIED.

3.      Sibille's motion for partial summary judgment (Doc. # 106) is DENIED.

DONE this 25th day of March, 2016.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE